We are, I think I can speak for my colleagues when I say we're glad to be in court with you today. I'm happy to be sitting with Judge Nancy Abudu and Judge Ed Karnes, hosting us here in Montgomery. We know that we had some schedule changes, so I'd like to thank all of the counsel for being flexible. We really appreciate that as the court. With that, we will go to our first case, United States of America v. Owens. Mr. Hunter, and so you all know, we, if you've reserved time for rebuttal, we'll let you keep that rebuttal, even if we keep you going over your time period. So if you're answering our questions, please feel free to keep going. Thank you, Judge. Good morning. May it please the Court. I'm Scott Hunter. I'm an attorney in St. Clair, Alabama. My friend Jason Darley, his office is in Mobile, Alabama. We represent Mr. Adam Owens. Mr. Owens pled guilty in the Southern District of Alabama to a gun charge and was sentenced to 120 months in prison. The guidelines only called for 60 months in prison. The district court's doubling of those guidelines was improper, and we asked it be vacated. To his credit, government, even at the hearing, was asked, do you want to change your mind? And they stood by their word and said, no, we made an agreement. We're going to stay for 60 months. Nonetheless, the judge still doubled the guidelines. This case should be remanded back to the district court with instructions to honor that agreement. The district court based its enhancement beyond the guidelines for two unconvicted and uncharged criminal acts that were mentioned in a couple parts of the PSR, pre-sentence investigation report. And because the 120-month sentence is above the guidelines, but it's less than the statutory maximum, which in this case is life, so there's no greater risk than death. But he had to have found that those two bad acts were committed by a preponderance of the evidence. My experience, much of my experience as an attorney has been as a civil attorney like all these guys behind me. And so I'm familiar with the preponderance of the evidence standard. And I can tell you that if this case had a CV designation instead of a CR designation in district court, the case would have been, with these facts, the judge would have given a JML for the defendant. Because what was presented at that hearing falls well, well short of the standard required for preponderance of the evidence. Well, in terms of the death of B.B., we know that there was ample evidence of text messages between the two of them, a drug deal that happened the day that he died. And real concern it seemed from the district court that the drugs that your client sold him might have actually been counterfeit pills, which if I'm understanding the district court's he believed that there was a reasonable basis to conclude that the drugs killed him. B.B. You're right. Regarding Mr. B.B., the only evidence that was presented at that hearing was hearsay testimony from an officer that was in the mobile narcotics unit five years prior that B.B.'s death occurred in 2017. So he was telling a story from a job he used to have that happened five years ago. Which the district court could credit having heard his testimony. Yes, but the court can rely on hearsay during ... Did you object to it on that ground? Yeah, Mr. Darley did. I was not the trial lawyer, but Mr. Darley was. And he objected, well, regarding the hearsay, he objected to the use of the hearsay testimony to enhance the sentence. But under the law from this court, hearsay is permissible in a sentencing, and a court can rely on it. But there has to be what you all call an indica of reliability. There has to be something else in the record that shores up that hearsay. I cited the Gertler case, and that's one of those that says that you have to have something else that's reliable. And so you look at all these cases that cite Gertler, and they all talk about, well, okay, yes, there's hearsay, but we also have ... There was no text messages introduced? There was no documentary evidence. There were no cameras. There was no autopsy, no TOPS report. Nearly the same piece of paper. I didn't see in your brief an argument that it was error to admit the hearsay. No, because it's not error to admit hearsay in a sentencing. Okay, then the judge properly considered it. You can't admit something you can't properly consider. The distinction in this argument is not that the hearsay shouldn't have been admitted. The argument is that the hearsay by itself with nothing else to shore it up is not enough to give this man five extra years in federal prison. If there's not enough in that record for one of these guys to get a money judgment for their client, there's surely not enough in this record to send a man for five extra years in prison. All the court had during that hearing was hearsay. There was discussion during the testimony about text messages, about cell phone, about TOPS reports, about autopsies. None of it was presented. There was nothing in the record to bolster that hearsay and for that hearsay to stand on in support of the conclusion regarding the bad act about the death. But your client, or Mr. Owens, never objected or challenged the fact that he sold B.B. those drugs on that date, right? They did object. One of the other issues is, Your Honor, is the issue that ... Well, no. They objected to whether or not Mr. Owens, the drugs that Mr. Owens sold caused B.B.'s death, but I didn't see any objection and maybe I missed it as to whether or not Mr. Owens sold drugs that day. Well, Your Honor, regarding that, well, the death, the TOPS report and the PSR stated that he died from fentanyl. Yes. Mr. Owens was only charged and Mr. Darley did cross-ask the officer. He said, well, my guy's only been ever caught with oxycodone. And I also pointed out during the background of the DTO, the Drug Traffic Organization, it talked about the fact that the DTO started out with opioid pills in 2016-2017 and they didn't move to fentanyl until 2020-21. But there's also, and this is one of my questions, the judge said it was widely known or relied on wide knowledge that a lot of the drugs being on the street at that time were contaminated with fentanyl. Yes. Now, that is close to widespread enough knowledge we could take judicial notice of it. To that end, I think you would find some narcotics officers in the Mobile area and some attorneys that prosecute and defend these cases that say that fentanyl wasn't bad in Mobile in 2017. Do you have any testimony to that effect, though? Well, that's the thing. If we're going to say, well, everybody knows that fentanyl is out there, well, then everybody should also be able to know that in 2017, fentanyl wasn't bad in Mobile and that opioids was a problem in Mobile. And in fact, again, the PSR that describes this Drug Traffic Organization points that out, that they started in 2016-2017 with opioids. And then they transferred as time progressed, they transferred to meth and fentanyl. And so, the gap in time between the death of B.B. and when this hearing happened is five years. There's a lot that had gone on in the drug trade in five years in Mobile. And so, they're taking the 2022 knowledge and applying it to a 2017 fact pattern. And that's where, in my opinion, that's where that becomes unreliable. Again, also, they're just going, hey, everybody knows everything's laced with fentanyl nowadays. Again, if that's the basis for accepting that he caused the death, that is not a preponderance. It is not more likely than not. When you have no connection at all, you have no documentary evidence, you have no allegations that he ever sold anything that was laced with fentanyl. The only thing, he was charged with opioids. That's all he'd ever sold. That's all he'd ever been caught with. Can we talk about what happened in the jail? I believe there was also a substance that he took out of his hair that was caught on video. The warden testified to that. The warden that was removed from his position right after briefing, he testified that he was watching surveillance camera because he bought a new toy to check for cell phones. And he said he watched it and that he watched Mr. Owens pull stuff out of his branch. To that, again, no physical evidence. Excuse me, did the warden testify to that? Yes, Judge. You don't need physical evidence. Excuse me? You do not need physical evidence when a witness says, I was there, I saw this, this is what I saw. You know that. With regards to that, he wasn't the one that was actually doing the search. He was watching TV. Don't watch TV. To that end, we asked, well, where's the corrections officer that had this? We don't know. I'm going to stop. Thank you, Judge. Thank you. Mr. Darley, will you hand over the bottle or are you going up now? No, I'll hand over the bottle. Okay, great. Ms. Tripp. May it please the Court, Marjorie Lundstrom, appearing on behalf of the United States. At the heart of this appeal are two factual findings that the district court made at sentencing. First, the court found that Owens possessed Suboxone in jail to distribute. And second, the court found that the drugs Owens sold to Beebe resulted in Beebe's death. Now, can you talk about how the court could make those factual findings when, number one, at the jail, there was no testing of the substance that was found on Mr. Owens? And with respect to Beebe's death, the drugs that Mr. Owens actually admitted to selling him were not the drugs that caused Beebe's death? Yes, Your Honor. First, as to the Suboxone finding, the warden at the time was watching the search as it was occurring on camera in his office. He testified that he saw Owens remove the items from his hair and put them down. He saw the corrections officer seize those items in the area where Owens had put them down. And he also observed the items in person when the corrections officer brought them to him. Now, the warden had experience in law enforcement starting in 2007. He was in law enforcement and also a jail administrator in Escambia County. And then he had been the warden of the Conecuh County Jail for approximately two to three years at the time of the search. The district court here could have reasonably inferred that based on the warden's experience, And also I should note that that facility, the Conecuh County Jail, had been experiencing problems with drugs incoming. So the district court here reasonably could have inferred that the warden, based on his experience, could recognize the Suboxone. In addition, when it was presented to the warden during questioning that these were Suboxone strips, the warden never contradicted that finding. So here it was reasonable for the district court to infer that this warden knew what Suboxone was when he saw it. As to B.B.'s death and the particular drugs, the police sergeant... Before you get on that, I didn't see that issue. Did they preserve at the second sentence hearing, the one that counted, Did they preserve the argument that it might not have been Suboxone? If I recall correctly, I know with respect to B.B.'s death, they argued that he sold Roxycodone or Oxycodone. But I believe with the Suboxone, it was the lack of a toxicology report, which was the objection. So it was more of a sufficiency of the evidence as to whether the substance was in fact Suboxone. But as to B.B.'s death, the police sergeant testified that there was a huge problem, as he described it, with counterfeit pills containing fentanyl, including Roxycodone, which is what Owens claimed that he sold the defendant. Now, the police sergeant had viewed the text messages, as Judge Carnegie had noted. He viewed the toxicology reports. He viewed the autopsy reports as well. So in that instance, there was sufficient evidence for the court to determine that this was a reliable witness. As for the fentanyl itself, based on the time that Owens met with B.B. and the time that B.B. died was maybe five to six hours. And also, we have to recall that the drug trafficking organization here also sold fentanyl as part of their conspiracy. So with all those facts being considered, the district court could reasonably infer that the drug B.B. purchased from Owens resulted in his death. All right. Now, what was the evidence, if any, that the drug ring that he was associated with sold drugs contaminated with fentanyl? There were a few overdoses and deaths that resulted from the drugs that the conspiracy sold. If I recall specifically, one of the co-defendants, William Owens, sold drugs that resulted in fentanyl deaths and was prosecuted for that. But in this instance, even though we don't have toxicology reports, it was reasonable for the court to make that connection from the drugs that B.B. purchased from Owens to the conclusion that B.B. died from those drugs and that fentanyl likely was contained in those drugs. So anytime somebody dies within five to six hours after purchasing drugs from one of their regular suppliers, that's sufficient to infer, and he died from a drug overdose five to six hours later. That's sufficient evidence. Not necessarily, Your Honor. The reviewing court and the district court would have to look at the totality of the circumstances. And the circumstances here are very, even though it's not a published case, the analysis is applicable here. In the suppression case, the court looked at numerous factors, including the time frame within which the defendant had purchased the drugs that resulted in his death. They looked at the fact that the defendant had admitted that he sold the individual drugs within that time frame. And here, there's no disputing that Owens sold drugs to B.B. hours before B.B. died. That point has not been contested. What's your response to opposing counsel's point that maybe in 2022 drugs are often contaminated with fentanyl, but that wasn't the case at the time of this incident? Well, there's no evidence to support that. That was not elicited at trial. But also, fentanyl, and I don't know how long fentanyl has been around, but it's conceivable because controlled substances, as the district court noted, are controlled for a reason. The manufacturer controls the manufacturing process. They'll guarantee that the patient is getting what they're supposed to get, and it's not contaminated with anything else. This drug trafficking organization was involved with numerous drugs, including fentanyl. So it's conceivable, and the district court could have reasonably inferred that there possibly could have been some sort of contamination that occurred. Simply because there's an allegation that a particular drug did not become a problem, a major problem, until a certain time later does not automatically lead to the conclusion that it's impossible for the drugs that B.B. purchased to have been contaminated in some way, shape, or form, which resulted in his death. But what about the fact that the evidence showed that there were two drug dealers involved in B.B.'s transactions that day? Did the case you just cited involve multiple drug dealers? It did not, Your Honor. But to that point, I would say that the district court was not required to rule out every conceivable scenario or every possible cause of death. What it was required to do, which it did in this case, was to consider the evidence before it and determine whether or not B.B. It was more likely than not that the drugs B.B. purchased from Owens resulted in his death. And the court did exactly that in his case and reached the correct conclusion based on its consideration of the evidence. I saw somewhere, and I think it was in your brief, it may have been elsewhere, that there were no text messages or messaging between the other drug dealer and B.B. immediately preceding his death or the day of his death. Where did I get that? Yes, Your Honor. The police sergeant did testify that the day that B.B. died, that the two did exchange text messages. They arranged to meet at a particular location, and they, in fact, did meet approximately 4 or 5 p.m. in the afternoon, and he corroborated that based on cell site data that was downloaded. So they did, in fact, meet and consummate the transaction that they had agreed on. And B.B. was found dead at 11 o'clock that night. So that's a tight time frame during which there really is no evidence that there were any other interactions with any other drug dealers but for Owens. But the court should affirm, based on the preponderance of the evidence as to both of these factual findings, the district court, in requesting additional testimony and evidence, properly ensured that Owens' due process rights were recovered. The court gave notice in that the court explained that it was concerned about these two paragraphs in the PSR. The court also gave Owens an opportunity to be heard, to present testimony, to cross-examine witnesses. So in that respect, the court also fulfilled all of its responsibilities. What do we do if we find, agree with you on one issue or sub-issue, disagree with you on the other? Your Honor, with respect to the death findings specifically, I would argue that the court does not need to reverse because the district court here . . . I understand. You argue we don't need to reverse on either one. But if we decide, for example, we reverse on the death finding but not on the Suboxone cell inside the jail, what . . . do we go back and say, okay, just reconsider this one finding? Or is the judge free to reconsider the entire, I believe we call it, sentence package? Your Honor, I believe the judge would be able to reconsider it based on all the evidence. And also at this point, the government would be able to present additional testimony. But again, we have to remember the district court here gave a keen statement. The court stated that even absent Beebe's death, absent that consideration, it would still have imposed the same sentence. And it based that on a number of factors that it noted. First of all, it noted it considered Owens' background. It also noted that it considered that Owens continued to flout the drug laws as evidenced by his possessing Suboxone in jail while awaiting sentencing and with the intent to possibly distribute it. The court also looked at the conspiracy as a whole and Owens' role in that conspiracy. So considering all that, the court made it clear that it would have imposed the same sentence regardless of its consideration of the death. And I should also note that in that regard, those factors support the substantive reasonableness of the district court sentence, which hasn't been challenged on appeal. But the court didn't say, even if I was wrong about the in-jail cell and possession with intent to distribute inside the jail, I would impose the same sentence. It didn't say that. That is correct, Your Honor. The court did not say that. It specifically only addressed the death. So we can infer from that that that was critical to the sentence. It was one of the bases for the sentence. But he said, you've got A and B. If it wasn't for A, I'd still impose this sentence. Period. Silence. That implies that if it wasn't for B, he wouldn't impose the sentence. In any event, under Keene, you've got to be explicit, and he wasn't about B. Correct. Yes, the court did not consider the Suboxone as part of its Keene statement. However, if the court looks at the overall reasoning for the sentence that the district court imposed, he addressed several sentencing factors in that regard. He addressed the history and characteristics of the defendant, the nature and the circumstances of the offense. The court mentioned numerous times that it was concerned with public safety because of the extent of this drug trafficking organization, the damage it has caused. It had resulted in deaths and overdoses. How did the district court reach the conclusion or the fact finding that the Suboxone strip, or strips, I never could find out which, that were seized from the defendant weren't for personal use as opposed to distribution? There was no testimony on that particular point, but the court was reasonable in inferring that it was for distribution. First, the drug trafficking organization, one of their primary means of communicating with buyers was cell phone, and the defendant was found with a cell phone in his possession during that search. But people use cell phones for things other than arranging drug deals, even in prison. Thank you, but the fact that this particular defendant had a history of being one of the core members of this drug trafficking conspiracy and had Suboxone combined with a cell phone in his possession was strong evidence for the district court to conclude that it was more likely than not that he possessed that Suboxone to distribute it. Also, the jail warden had testified that there was a huge problem, again, with the drugs in that facility, and he also testified that the individuals, the inmates in the jail, were using Cash App to make money right and left from selling drugs, and that is a cell phone application. So looking at all those factors together, it was reasonable for the court to infer that he intended to distribute. Go ahead. Can you tell us whether the record shows whether it was strips or a strip of Suboxone? If I recall correctly, at one point in the record, it did say eight strips. Yeah, that sounds right. But during the testimony itself, there was, I don't recall that there was a specific, but I do recall seeing eight strips, and I believe that was in the pre-sentence investigation report. Of course, how many pills in a strip? I don't believe the strips are pills. I think they're actual strips, and I'm not familiar with Suboxone itself, but they were always referred to as strips, so I envisioned what a typical strip would be. But I see that my time is expiring, but again, I would like to reiterate to the court that the two factual issues that were raised in this case, the factual findings were supported by a conference of the evidence, and that evidence established that it was more likely than not that Owens possessed Suboxone in jail to distribute. And it was more likely than not that the drugs Beebe purchased from Owens resulted in Beebe's death. In light of all that evidence and the sufficiency and the weight of it, this court should affirm. Thank you. Thank you. Mr. Darley, you've got five minutes. I'm Jason Darley. I represent Adam Owens. The big picture here is that 48 defendants were charged in this original conspiracy. Mr. Owens was charged in the overriding conspiracy, count one, and then 17 through 19, which were drug counts, and then the gun. He ultimately pled guilty, and I would submit because there were issues with the levels of proof that the government had, and I will provide a few examples. He only pled guilty to the gun. He only, and I know relevant conduct can be brought in on the back end as it always is, but he only pled guilty to the gun. Secondarily, at sentencing hearing all the way to the very end, the U.S. attorney that prosecuted this case still only asked for the five years that he believed, I would submit to you, was reasonable because of the problems of proof. Well, of course, he thought it was reasonable because he avoided a trial from his perspective. That's what plea bargain is all about. Absolutely, but one of the main individuals in this case went to trial, and they were going to trial regardless on a number of- Yeah, but that doesn't mean that the reason he pled guilty is he thought he had a weak case. No, it is not the only reason, but I would submit respectfully to the court that it is a reason. Where do we look in the record to see the U.S. attorney's or the prosecutor's statement to that effect? Well, I would say that it could be inferred in the sentencing hearing when he still maintained that this was the sentence that they requested pursuant to the plea agreement. That's because he has an obligation. Once he commits to support that sentence as part of the plea bargain in return for the conviction in hand, he has to support it. Yes, sir, Your Honor. And so what we have here, Your Honor, is I would submit that when the Honorable District Court found out on the third draft of the pre-sentence report that there had been an issue in the jail when he brought us in in October of 2021, that I would submit that his mind was made up to enhance the sentence and not necessarily enhance it because it is within the statutory guidelines. But this, Adam Owens was a 21, he was 26 when this drug trafficking organization began. He was a criminal history category one defendant. And I would say we did reference Booker in the brief and a sentence has to be reasonable. And would this sentence based on this level of proof be reasonable if the judge had still stayed within the statute and give him 99 or 98 or 97? And so what I would say, Your Honor, to this honorable court is that there's a quality of proof that has to be looked at here. And if the government can bring in just simple hearsay witnesses, one, and I know the court can consider that and can rely on it, but one of the witnesses was terminated from his job the morning after we filed our briefs. I would just think that if you're going to use a sentence to have that picture of reasonability and reasonableness under Booker, if you're going to be able to slide down the scale of a much higher sentence on a lower level defendant. So anytime a jail warden is fired from his job and there's some misconduct at jail, we have to, just from that raw fact, consider it in the favor of anybody who's got an appeal? Absolutely not. But I would submit respectfully that it goes to credibility because we ask where, well, because. He could have been fired for being too lenient to prisoners. That's correct. But the fact of the matter is when we had asked, where is the suboxone? Where is the cell phone? Where is the contraband? Well, we turned it over for the state. I think you've got some better arguments than that, but that's just my opinion. But let me ask you this. Where exactly did you object, and tell me the words if you can paraphrase them, to him being charged by the judge for sentencing purposes with possession with intent to distribute as opposed to just possession? Of the suboxone? Yes. Per se there, there was not an objection to that. We objected to more or less whether the. . . Well, we did object to the fact that the suboxone was said to be a substance. And we know from experience that people spray paper and stuff. They bring it into the jails. There's a host of substances that go in just as the. . . I understand, but you never told the judge. You never told the judge. Don't find that he or you erred by finding that he possessed with intent to distribute. It was for personal use at most. We don't concede that, but if it was possessed by him, it was for personal use. You never objected to that. May I answer the question? Personal use only and that the substance was what they said it was because he was never charged. I mean, you're just repeating my words back to you. I'm asking you, did you ever tell the judge, don't find that he possessed with intent to transmit or sell. The most you can find is that he possessed for personal use. No, sir. It was the substance. Okay. Thank you, Your Honor. Thank you. And I see that you are a court appointment attorney for the appellant. And, Mr. Hunter, also that you are acting pro bono. We appreciate both of your service in this case. And, Mr. Tripp, we certainly appreciate your service for the United States as well. Thank you.